All right. Will the lawyers on Oakridge please step forward, identify yourselves, and tell us who you represent. Assistant Attorney General Aaron Dozman for the people of the state of Illinois. Good morning. My name is Richard Stowe. I'm the Assistant Attorney General for the people of the state of Illinois.  David Stavins, S-T-A-V-I-N-S, for the Epoly. All right. And as you probably know, the microphone that's in front of you is not for amplification. It's solely for recording. And so if you would keep your voices up during your arguments so that everybody in the courtroom can hear you, we'd appreciate that. Mr. Dozman, how much time do you want? Okay. And Mr. Stavins? Fifteen minutes would be fine. All right. And I will tell you that we have all read the briefs and are familiar with the record, and so use your time accordingly. Thank you. All right. Mr. Dozman, would you like to proceed? May it please the Court. I'm Assistant Attorney General Aaron Dozman. I represent the state in this enforcement action which was brought at the request of the Illinois Department of Human Rights. This case is about successor liability. And successor liability, whether it be under federal or state law, is about striking a balance between three things. Protecting creditors from losing their ability to collect, preventing wrongdoers from escaping liability, and allowing assets to find the most valuable use. Did the state argue the fraudulent purpose exception in the trial court? We did not argue that in our response to the motion for summary judgment. That is true. But based on the posture of the case and the record, I don't think that should stop this Court from reaching that issue. Okay. Why not? Because the motion for summary judgment I think was premature. It was filed within two months after the complaint was filed. No discovery had taken place. The theory of the motion for summary judgment was that as a matter of familial relationships and contract, they were not liable as successors. The motion itself also argued the four exceptions to the general rule of successor liability. We were also granted limited discovery in our response motion, so we didn't have the opportunity to build the case that we wanted. Did the state file a Rule 191B affidavit to say we can't respond because we haven't had enough discovery? We did. We did file a Rule 191B affidavit. And based on that 191B affidavit, we were allowed to depose the two affiance based on the two affidavits that were attached to the motion for summary judgment. And based on that, on those depositions, we think that there was sufficient evidence based on that to say that judgment as a matter of law for Oak Ridge Health Care Center was not proper. On what ground? Was it on the fraudulent purpose exception? Our main theory was based on the fraudulent purpose exception, but... Oh, wait, wait, wait, wait. In the trial court? Oh, I'm sorry. Let me restate that. It was based on the... Mere continuation. Mere continuation in the recognition of a standard that's developed under federal common law. Right. But really the theory generally is successor liability, and how we get there exactly is really... There's the fraud exception, there's also this federal common law analysis, and really what is the best way to analyze fraud in this context? And our primary argument was that federal common law has developed a standard that they've employed under many labor and employment statutes that is appropriate for this context. I don't think the fraud exception and the badges of fraud is that different from that, but yes, our main argument was that this federal common law, this Court should take the opportunity now to recognize this theory. So your theory in the trial court was not the Illinois mere continuation, exception, because that requires an identity of the corporate being itself. Yes. And what you were advocating in the trial court was adoption of the federal common law, which looks at whether the business operations of the successor corporation are the same as the predecessor, right? Yes. Okay. That's the most I can say about our posture in responding to the motion for summary judgment. Sure. What are the disputed facts here, though? This is a motion for summary judgment. What are the disputed facts? We don't have disputed facts. As far as I can tell from the response brief... Was there consideration for the transfer? No. There was no consideration, no valuation. Her position is that that's not a disputed fact as to whether or not there was consideration. And I believe that Helen said in her deposition she didn't know whether or not there was consideration, even though she was the person responsible for all of the financial business of the company. Well, she identified her husband, John Lysak, as the person who handled the financial stuff. There are undisputed facts, and there are inferences of the party's intent based on those undisputed facts. And there are two narratives based on that. One is that, which is the Oak Ridge Health Care Center's theory, is that they just did a straight business transaction. Nobody had any malintent. And the inferences that we think we're entitled to on summary judgment, which are reasonable, is that this whole transaction was done to escape liabilities. But under Federal common law, as you're advocating we adopt it, malintent doesn't even enter into it, does it? No. Right. It's just you have notice of the claim, an inability to satisfy the claim after the transfer, the ability of the transferee to satisfy the claim, and the continuation of the business operations. That's right. So where does malintent enter into it? Well, that would be under our first argument, under just summary judgment basics, that this record was not appropriate for summary judgment. Who retained the accounts receivable? The Oak Ridge Nursing and Rehab retained the accounts receivable. Right. Do we know how much the state owed nursing and rehab? That's not in our record at this point. Right. What I'll say about accounts receivable is this was a nursing home, and I think that the incoming money was either from the state or from the tenants. So once the assets are transferred, I don't know what would be coming in, what kind of revenue would be received. So I don't think that's a fact that weighs in favor. As I understand it, according to the affidavits, the state stopped paying reimbursement at some point. And without reimbursement from the state, nursing and rehab couldn't pay its rent. I mean, it counted on reimbursement for Medicaid and Medicare services rendered to its residents. So if nursing and rehab retained that accounts receivable, the amount that was due from the state, isn't that consideration? Well, what they said in their depositions was there was no exchange, there were no negotiations. I don't know if they had thought that far about it. I certainly can't say anything from the record about that position. But it seemed as though that's one explanation of why they were incurring liabilities at the time. But they're also incurring a liability or a liability was potentially on the books in the form of the pending discrimination claim. Well, had a complaint been filed yet by the department? A charge had been filed. Well, her charge had been filed. No complaint had been filed, and the department had not determined that it would file a complaint. Yes. It was nine months later. Whether the department files a complaint or not doesn't preclude the alleged victim from filing, pursuing the EEOC complaint or pursuing their own action in the circuit court. So notice of that charge, which I believe was in February 2011, was served on Oak Ridge Nursing and Rehab. So we can say that they had notice, certainly, of the charge in the spring before these liabilities started to incur. But, you know, their view is that the state of Illinois wasn't paying, we were getting behind on rent, therefore we transferred the assets and dissolved the company. But that doesn't necessarily absolve you of the successor of liability in that situation. There are inferences to be drawn from the way the transaction was structured and the events leading up to it and after it that infer that this was done to escape liabilities. And if Oak Ridge Nursing and Rehab retained the liabilities, that wouldn't be, I mean, your argument would be that wouldn't be any form of consideration. They're simply, this is just an asset that's not sold. But if you're selling all the other assets for no consideration, there's no consideration. Just to simply hold an asset back doesn't become consideration. Consideration is giving something of value. Is that what you're arguing? No, I'm not. The exchange of value, there was no exchange of value. There was just a transfer of assets. With nothing in return. Okay, so therefore this was a transaction done with no consideration. Exactly, yes. And so now it becomes something that when the argument is made, it's analyzed under fraud and law where there's no consideration and that creates a different presumption. Is that your argument? I'm not sure I understand the point about creating consideration, Your Honor. Well, no, not creating consideration. You're arguing there was no consideration. Yes. And I think the question that was asked of you is that because Oak Ridge Nursing retained the liabilities, that that would be some form of consideration. And I think you may have answered yes. No. If I was confused about that, I apologize. But no, there was no negotiations, no valuations, no exchange of value in this transaction. I think that's really all I can say about the nature of the transaction on this record and why we believe that a reasonable jury could find successor liability under state law. But we've also raised this issue of first impression, which is whether Illinois law is going to recognize the federal successor liability standard for violations of the Illinois Human Rights Act. Now, in the trial court, you said it wasn't an issue of first impression because Lindsay versus the Department of Human Rights had already adopted the federal common law standard. Well, I've read Lindsay, and I think that Lindsay acknowledges that the department follows the federal standard. So I think that was maybe predictive of what Illinois courts might do. But we haven't had an appellate court decision that this is the doctrine, this is the standard for violations of the Illinois Human Rights Act. And adopting this standard would be, first and foremost, consistent with the text of the act, which authorizes the department to pursue the successors of companies who commit unlawful discrimination. That's under Section 8-111C1. But the statute asides, successor liability has always been about equitable considerations. It's an equitable analysis. And the justifications for it, they make sense on economic grounds and under just fairness principles. Victims of discrimination should not be without recourse due to events out of their control. The asset purchasers are in the best position to negotiate the cost of these discriminatory practices into the price of an asset. And Illinois' policy against being a discrimination-free state are not frustrated. These justifications, I think, speak for themselves. But what I'd like to note is that adopting this doctrine today doesn't mean that it's automatic in every case. It just simply adds a presumption that successor liability will follow. And it just encourages parties to do their due diligence when they enter into these transactions. Are there any cases under the federal common law that say that a purchaser who does not have notice of a discrimination claim can nevertheless be held liable? In a multi-factor test, it's always based on the facts of the case. But it's under actual or constructive notice, and that's a fact-determinative analysis. And what the notice element does is it creates a presumption. So you can still overcome the presumption if these discrimination charges are concealed from the asset buyer. I could see that weighing in favor of not finding successor liability, but it would be a fact-intensive case-by-case analysis, and that's consistent with federal law and I think also where the state standard is also. And ultimately, a rule that doesn't leave discrimination victims left holding the bag and incentivizes parties to find the skeletons in the closet to do their due diligence is going to be the most fair and equitable rule in Illinois. This Court has no further questions for the State. I'll reserve my time for rebuttal. Well, I do have a question. In your brief, you point out that Helen was or the Rehab Center was $244,000, give or take, in arrears on rent to properties. True, yes. And Eli was a part of properties that was formed the same day as Oak Ridge Rehab. Helen and John were Oak Ridge Rehab. So they clearly had a close business relationship. Otherwise, it would just be an extraordinary coincidence that these two entities were formed on the exact same day. And we don't know how much of that $244,000, give or take, was money that was due and owing from the State of Illinois. I'm assuming that Helen expects to have some profit when she's running this place. So some of it was her natural profit and some of it was other expenses, but some of it was money that was due and owing from the State of Illinois. Yes. So we can't really track what happened to that $244,000 in rent arrears because she was going to keep all the accounts receivable. But we don't know for a fact whether that was still going to be the same $244,000. It might have been more. It might have been less. I don't know. And we do know that there's a sort of missing $210,000 someplace. I don't know about that. So I guess my question is if Oak Ridge Rehab and Oak Ridge Properties are formed on the same day by two people who had known each other for a period of time. As a matter of fact, they've been partners in the same business through a family member. Helen was one of the partners in McAllister when it was formed in 2007, about five months before Oak Ridge Rehab and Oak Ridge Properties. And Eli's wife, Donna, was a part of McAllister, but we don't know because she never discovered from their tax returns whether Eli benefited from Donna's participation in McAllister. But we know that Helen and the family had a close business relationship that already existed at the time Rehab Center Oak Ridge Properties and Oak Ridge Rehab Center were started. So I guess my question is if we can't track the $210,000 and we can't track the $244,000, how do we even know that this was a true purchase? We don't know a lot. That's a good point, Your Honor. We don't know a lot about this transaction because of the posture we were in and the limited discovery. And I think based on the amount of liabilities that incurred that seem to have never been collected and yet were personally guaranteed and the continuing business relationship raise a lot of questions. Well, when you say they seem to have never been collected, we don't know from this record. We don't know. And under the transfer agreement, when the state paid the arrears of Medicare and Medicaid reimbursement, those were to go to reduce the liability on Helen's guarantee on the rent, right? I don't know if those ever. They had to go straight to properties. I don't know if those ever. I don't know how those were ever handled. That's what the agreement provided. Yes, but we don't know what happened after that January 1, 2012 transfer, and we don't know where the money went. If we're talking about an arm's-length transaction, I'm still having trouble with this whole McAllister thing in 2007. Families form a business together, and then they form another business. One part is for the management of the operation. One part is to own the real estate. Oakridge is saying, oh, yeah, it was an arm's-length transaction. I'm having trouble finding how that's possible. Me too. We've got the finding by the commission and the order by the board that's out there floating around. We've got the $210,000 that was personally guaranteed by Helen for an early termination that's floating around. We don't know what happened to that. We've got the $244,000, give or take, in the rent arrears that's just floating around. And, I mean, I think that there are enough that that creates an issue of fact as to whether or not there was, in fact, a transfer of property, a transfer of the assets. I completely agree, Your Honor. And the, you know, it could have been that they never thought that was ever going to be paid. That could be the theory, that they would have been. Well, then that would not have been an arm's-length transaction. That would not have been. That would have been a very, very, very, very friendly transaction. Very friendly. I agree, Your Honor. Yes. If there are no further questions, then I will reserve my time for rebuttal. All right. Mr. Stevens. If it please the Court, this was not, we can see, a totally arm's-length transaction where the property is put up for sale in the open market. An independent buyer comes in and buys. Because this was a business that was failing because the State of Illinois, in one of the great ironies of this case, wasn't paying the reimbursement to nursing and rehab. And nursing and rehab then had a choice to either stiff the landlord or stiff the employees. If you stiff the employees, one paycheck, they're going to walk. And you can't have that happen in a nursing home. The families will take the patients out right away. So they stiff the landlord. The landlord properties was formed in 2008. At the same time, nursing and rehab was formed. And nursing and rehab was owned by LASIC. LASIC is totally unrelated to the Atkins people. They know each other. Absolutely, they were in business over the years. They were partners in McAllister. They were partners in businesses, yes. Was McAllister suspended or terminated or dissolved at any time in this process? McAllister had nothing whatsoever to do with it. I'm just asking the question. What happened to McAllister? Honestly, I don't know. I'm sorry. It's not in the record. I just don't know. So that's another fact that would be interesting to find out, whether they're business partners in another entity at the same time that all of this stuff is going on. Yeah. So if we're looking at facts that are missing from this record that were not able to be discovered, that might be one of them. On that issue of not able to be discovered, the state of Illinois never asked for more discovery. They were given the right to take two depositions. They took the two depositions, very lengthy depositions, and they could have asked for more discovery if they wanted it. Summary judgment, there are no facts at issue. And here I have identified two or three that are important to the resolution of whether or not there was, in fact, an actual transaction. Well, there absolutely was a transaction. There absolutely was a transfer of the assets. Was there consideration? The consideration was this business was failing, and somebody was established to take over a failing business. It was going down the tubes because it wasn't having sufficient income to be able to pay the rent. There was no transfer of money. It was a fire sale of the business. They had to sell. A sale was simply a transfer of assets but no transfer of liabilities. There's a transfer of assets and no transfer of the liabilities. That's correct. So it's transfer of assets without consideration. The consideration was? Because if you want to give me all of your assets and I'll take your liabilities, of course I'll take them. If I don't have to give you anything in exchange for your assets, and you have a Mercedes, I'll take it. We should get going. There wasn't a transfer. You're saying there was a transfer of assets, but the accounts receivables weren't transferred. The accounts receivable were retained by the transferor so that the transferor still had the potential income from the state. That was the big receivable. It was a very generous fire sale to Helen. That was the way it was structured. By two people who may or may not be partners in another business venture. They may or may not be partners in another business, but the entities, the corporate entities or the LLC entities, were legitimately properly established. And, as Your Honor, Justice Mason asked initially, the state never made this argument that this was an alleged fraudulent transfer in the circuit court. But you made the argument. The trial court had an opportunity to address it because you argued it in your motion for summary judgment. We never said that there was a fraudulent transfer. You listed the various exceptions and you argued that one of those exceptions is where there is a fraudulent transfer. Yes, we enumerated the four exceptions. Yes, absolutely. Because we went on to explain that this was not a fraudulent transfer. I don't think we were saying, we were arguing all those points, but the state never contended that it was a fraudulent transfer. We were talking about the four exceptions to the rule, which have been the four exceptions from time immemorial in this state. As I pointed out in the brief, six months after this court became a court of record was very decisive. In 1935, this court said, it has long been established in this court that there is a rule of non-liability of the corporate successor of a transfer of the assets and that there are four exceptions. That would be if we believed that there was really a transfer of the assets. There's no doubt that health care took over the building, which it already owned, and the services and the staff and the frozen food. No doubt about that. But my question still goes to how do we know that that was a legitimate transfer? When she gets to keep $210,000 from the lease, she gets to keep accounts receivables and she never has to pay him the $244,000 in rent. That money that was retained, that receivable that becomes money when the receivable is paid, was available, and I'm not saying that they thought about this, because I don't think they gave this claim a second thought. Think about starting with $44,000? No, let me finish my sentence. They never thought about, there's no evidence they thought about the claim by the plaintiff. But that $244,000 receivable that was retained was available to pay this claim by this claimant if it ever ripened into a judgment. And, in fact, there's a judgment against the transferor for the amount of that claim plus interest. I don't think the state has ever attempted to claim it, to collect it, I mean, from the transferor. But there's a judgment there. And I recall a provision, as I asked Mr. Dozman, I recall the provision from the transaction documents that said, if and when nursing and rehab collects on the receivable from the state, that it was due to properties for the past due rent and Helen's guarantee of the lease. Yes. I don't understand the exclusion of accounts receivable from the assets transferred to mean that Helen Lasik gets to keep whatever the state reimburses, that she'll get $250,000. All I can say is that's the way it was structured. I had nothing to do with the entity back then. I don't know exactly why they structured it that way, but that was the structure. But the point of my question is that when the state resumed Medicare and Medicaid reimbursement payments, they didn't go into Helen Lasik's pocket. They went to properties to pay down the past due rent and Helen's guarantee or the early termination fee under the transaction documents. I don't know what actually happened. None of us knows because the record doesn't reveal it. But if the transaction worked out the way the party structured it, those monies would go to properties because they were owed to properties, right? Yes. Yes, that's correct. All right. So then the original claimant in the civil rights action would not have any deep pockets to go after under your theory because health care is not liable as a successor corporation and Helen doesn't have the money. It depends upon the amount of the money. But the public policy in Illinois is to reimburse people who have been discriminated against because of age. So how do we make that work then? It depends upon the amount of money that was paid by the state and the amount of money that was owed to properties as to whether there would be money there. And as I said, Your Honor, a minute ago, I'm not claiming that they structured this in order to save and set aside money for this claim. I'm not saying that because there's nothing to indicate that that was done. I'm not making that argument. Is there anything to indicate that the state ever filed a judgment lien against nursing and rehab? A lien of the judgment in this case? Right. I don't know what the state has done to try to collect the judgment. Yeah. But they have the judgment. Yeah. And then finally, I'm the argument that there should be a fifth exception to the four exceptions created because the person who was discriminated against is a meritorious claimant. I agree. That person is a meritorious claimant. But every plaintiff is a meritorious claimant. And this Court has repeatedly rejected such efforts by meritorious claimants. Wrongful death claims, personal injury claims, wage claims. Wage claims certainly are meritorious claims against the transfer or employer, but that was rejected by this Court as a fifth exception. And finally, I'll say the Supreme Court itself in the Vernon case said there's only four exceptions. There's not room for creating a fifth exception or a sixth exception. And business transactions are done in this state based on this body of law. And they are structured this way. They've been structured this way. They've been done this way for 100 years based on the non-liability of the successor entity with the four exceptions that balances the rights of the creditor and the rights of the claimant as best we can. It isn't perfect, but it's the system, it's the balancing that's been done under the body of law from this Court or the Supreme Court at least as long ago as 1935. And since this Court wasn't even a court of record before January 1, 1935, I didn't bother going back and looking for cases older than that because they're not governed by stare decisis. But this is a pretty well-established body of law, but one rule with four exceptions. And respectfully, I don't think we fit within any exception, and this state waived. By not arguing, now called forfeiture, the state forfeited that argument about fraud by not arguing that in the circuit court. Thank you very much, Your Honor. Thank you, Mr. Stavins. Mr. Gozeman. On the question of what we've done to collect against Oak Ridge Nursing and Rehab, we filed this action. And it's a dissolved company. We know that it was dissolved in 2014. It's not going to produce any money to compensate this discrimination victim. Well, but if, and again, the record is not complete on this issue, had the state filed a judgment lien against Nursing and Rehab, recorded a judgment lien, and the state paid reimbursement to Nursing and Rehab, the lien attaches to those payments before they go to properties, right? That lien would have priority over any payment for back rent. This didn't become a judgment until 2014, and the department has the option of pursuing an enforcement action. They chose that route, and I don't know if that should work against them. I want to more fully answer the Lipsey decision. The question in that case, why the court didn't necessarily get to the adoption of the thing, the federal standard was whether a municipal agency was an actual successor, whether the city of Chicago was a successor to a municipal agency and just wasn't, as a matter of law, a successor. And finally... But you didn't say Lipsey in your brief in this court. No, no, just that it was raised. I wanted to more fully explain my answer on that. And finally, I think both sides are in agreement that this is a balance between creditors collecting and the fluidity of assets in the marketplace, and I don't think that Illinois should adopt an analysis that leaves discrimination judgment holders with the legitimate claims being precluded from pursuing these types of actions. And the federal standard is appropriate for these contexts, and it shouldn't be outcome determinative whether this pro se person went the administrative route or whether they filed an EEOC claim and pursued a Title VII. And that should not be a determinative issue of whether you have the ability, potential ability to collect your judgment later on. If there are no further questions, I ask that you adverse and remand this action. Thank you. Thank you. Thank you to counsel for your briefs and your excellent arguments here today. We will take the matter under advisement.